1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10   WILLIE B. COLEMAN

11              Petitioner,                No. 2:09-cv-0020 DAD

12        vs.

13   D.K. SISTO

14              Respondent.         ORDER

15   _____/

16              Petitioner is a state prisoner proceeding through counsel with an application for

17   writ of habeas corpus under 28 U.S.C. § 2254.  He challenges a 2006 judgment of conviction

18   entered against him in the Solano County Superior Court on charges of second degree robbery

19   (Cal. Penal Code § 211), assault by force likely to produce great bodily injury (Cal. Penal Code §

20   245(a)(1)), and an enhancement for personal infliction of great bodily injury (Cal. Penal Code §

21   12022.7(a)).  The parties have consented to the magistrate judge's jurisdiction under 28 U.S.C. §

22   636(c).  The matter has been fully briefed by the parties.[1]  Below, the court will summarize the

23   /////

24   _____

25   [1]  On November 9, 2010, after the filing of the pro se traverse, the court appointed
     counsel to represent petitioner in these federal habeas proceedings in light of the complexity of
     the legal issues involving his ineffective assistance of counsel claim.  (Dkt. No. 16.)

26   Supplemental briefing by counsel for both parties has been filed as requested by the court.

1  factual and procedural background of the case and address each of petitioner's claims for federal

2  habeas relief.

3  PROCEDURAL AND FACTUAL BACKGROUND

4  On appeal in state court, petitioner argued that the evidence introduced at his trial

5  was insufficient to support his conviction on all of the charges against him and that his right to a

6  fair trial was violated by jury misconduct.  (Answer, Ex. 1; Clerk's Transcript on Appeal

7  (hereinafter CT), 248.)  The California Court of Appeal for the First Appellate District affirmed

8  the judgment of conviction on June 25, 2008.  (Answer, Ex. 4.)  The state appellate court's

9  opinion on direct appeal provides the following factual summary of the case:

> On September 16, 2003, at about 5:30 in the afternoon, Keith Vershay was driving along Pintail Drive in Suisan City, on his way home from his work at Travis Air Force Base.  Because of the heat he had lowered the vehicle's windows on both sides.  An African-American male stepped in front of the vehicle, and Vershay "slammed on the brakes."  The man approached the vehicle, leaned through the open front passenger window, and made some remark as if accusing Vershay of trying to hit him.  Vershay told the man he should "stay out of the road."  The man then "took a jab" at Vershay.  At that same moment Vershay felt a pain in the back of his head and "blacked out."

> Other witnesses testified that several young adult African-American males converged on the driver side of the stopped vehicle, pulled Vershay out onto the street, and began beating and kicking Vershay's face and head.  Two witnesses, attempting to intervene, began shouting at the males, who then ran off.

> Vershay's injuries, in addition to surface lacerations, bruising, and a swollen eye, included seven facial fractures and two breaks in his lower jaw.  Because of the fractures both cheekbones were "caved in."  The injuries required some four hours of surgery to set and wire his jaw and restore the cheekbones to their proper position.  Ultimately Vershay was left with scarring and a loss of muscle control in lower right side of his face.

> Vershay testified that his basketball shoes had been taken.  Another witness stated that he saw one of the attackers remove something from a wallet he had taken from Vershay's clothing, and toss the wallet onto the street before running from the scene.

/////

1

2   An information filed January 6, 2004, charged defendant as one of
those who had attacked Vershay.  It alleged a felony violation of
section 211 (second degree robbery), and a felony violation of
3   section 245, subdivision (a)(1) (assault by means of force likely to
produce great bodily injury).  The information also included an
4   enhancement allegation under section 12022.7, subdivision (a), to
the effect that defendant personally inflicted great bodily injury in
his commission of the robbery and assault.  On January 12, 2004,
5   defendant entered a plea of not guilty.

6   Defendant's jury trial commenced over two years later, in March
2006.  On March 20, 2006, the jury returned a verdict that found
7   defendant guilty of both counts and found true the enhancement
allegation.

8
Defendant filed a motion for new trial on May 3, 2006, on the
9   ground of juror misconduct.  At the sentencing hearing, held on
June 13, 2006, the trial court denied defendant's motion.  The court
10   went on to impose an upper term of five years imprisonment for
defendant's conviction under section 211 and a consecutive term of
11   three years based on the enhancement allegation under section
12022.7.  The court stayed imposition of sentence for defendant's
12   conviction under section 245, pursuant to section 654.[2]  Defendant
filed a notice of appeal the following day. (§ 1237, subd .(a).)

13

14   (Id. at 2-3.)

15           On August 9, 2007, petitioner filed a petition for writ of habeas corpus in the

16   California Court of Appeal for the First Appellate District, claiming that his trial attorney had

17   rendered ineffective assistance.  (Answer, Ex. 5.)  That court denied the petition in a reasoned

18   decision dated June 26, 2008.  (Answer, Ex. 6.)  Petitioner also filed two petitions for review in

19   the California Supreme Court, both of which were summarily denied.  (Answer, Ex. 7.)

20                                   ANALYSIS

21   I.  Standards of Review Applicable to Habeas Corpus Claims

22           A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

23   some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860,

24   _____

25       [2]  "At the same time, the court imposed an additional consecutive sentence of two years
eight months imprisonment, based on a prior conviction and enhancement finding as to which
probation had been revoked."  (Originally footnote 3 to the opinion on petitioner's direct appeal
26   (See Answer, Ex. 4 at 3).)

861 (9th Cir. 1993); <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing <u>Engle v. Isaac</u>, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation or application of state law.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Park v. California</u>, 202 F.3d 1146, 1149 (9th Cir. 2000); <u>Middleton</u>, 768 F.2d at 1085.  Habeas corpus cannot be utilized to try state issues <u>de</u> <u>novo</u>.  <u>Milton v. Wainwright</u>, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  <u>See</u> <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997); <u>Clark v. Murphy</u>, 331 F.3d 1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

<u>See also</u> <u>Penry v. Johnson</u>, 532 U.S. 782, 792-93 (2001); <u>Williams v. Taylor</u>, 529 U.S. 362 (2000); <u>Lockhart v. Terhune</u>, 250 F.3d 1223, 1229 (9th Cir. 2001).  If the state court's decision meets one of the criteria set forth in § 2254(d), the federal court must conduct a <u>de</u> <u>novo</u> review of a habeas petitioner's claims.  <u>Delgadillo v. Woodford</u>, 527 F.3d 919, 925 (9th Cir. 2008).  <u>See also</u> <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment.  <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir. 2004).  <u>See also</u> <u>Barker v.</u>

1   Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005) ("When more than one state court has adjudicated

2   a claim, we analyze the last reasoned decision").  If the last reasoned state court decision adopts

3   or substantially incorporates the reasoning from a previous state court decision, this court may

4   consider both decisions to ascertain the reasoning of the last decision.  Edwards v. Lamarque,

5   475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  If the state court reaches a decision on the merits

6   but provides no reasoning to support its conclusion, a federal habeas court independently reviews

7   the record to determine whether habeas corpus relief is available under § 2254(d).  Himes v.

8   Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir.

9   2002).  When it is clear that a state court has not reached the merits of a petitioner's claim, or has

10  denied the claim on procedural grounds, AEDPA's deferential standard does not apply, and a

11  federal habeas court must review the claim de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th

12  Cir. 2003).

13  II.  Petitioner's Claims

14          Petitioner seeks federal habeas relief from this court on the following grounds:

15  (1) his right to a fair trial and impartial jury was violated when some of the jurors discussed

16  petitioner's decision not to testify in his own defense and when one of the jurors discussed his

17  own professional law enforcement experience with photographic lineups;[3] (2) the evidence

18  introduced at his trial was insufficient to support petitioner's conviction on the charges against

19  him; (3) the trial court's imposition of the upper term sentence violated petitioner's right to a jury

20  trial; and (4) petitioner's trial counsel rendered ineffective assistance.

21      A.  Juror Misconduct

22          Petitioner claims that his federal constitutional rights were violated by two

23  instances of juror misconduct.  First, petitioner claims that the deliberating jurors discussed his

24  decision not to testify in his own defense, in violation of a jury instruction that they were not to

25

26          [3] Petitioner was identified as an assailant in the attack twice – once by Keith Vershay, the
    victim, and once by Laura Samuels, an eyewitness who intervened to stop the assault.

consider petitioner's failure to testify.  (Pet. at 8.)[4]  Petitioner contends this was prejudicial

misconduct that violated his right to a "fair, impartial jury guaranteed by the Sixth and

Fourteenth Amendments."  (Id.)  In the second instance, petitioner claims that one of the jurors, a

former police officer, discussed his personal experience with photographic lineups.  (Id. at 10.)

Petitioner argues that this too was improper and violated his rights to "a fair, impartial jury, to

confront witnesses against him, and to due process."  (Id.)

The California Court of Appeal rejected petitioner's claims of juror misconduct,

which he asserted on direct appeal from his conviction.  The state court reasoned as follows:

> 1. Introduction
>
> Following the jury's verdict in March 2006, defendant moved for a
> new trial on the ground of jury misconduct.  (See § 1181, subd.
> (3).)  He contended the jury, during deliberations, had improperly
> considered his failure to testify, despite the court's instruction to
> the contrary.  He also urged that the statements reportedly made by
> one juror showed not only personal bias against himself but also
> disclosed an improper discussion of extraneous information
> relating to the prosecution's eyewitness identification evidence.
> Defendant here challenges the trial court's denial of that motion.
>
> . . . We consider first whether jury misconduct actually occurred.
> In doing so we accept the trial court's credibility determinations
> and findings on questions of historical fact if supported by
> substantial evidence.  (People v. Majors (1998) 18 Cal.4th 385,
> 417 (Majors).)  If we conclude misconduct did occur, we review
> independently whether defendant suffered prejudice as a result.
> (Ibid.)
>
> In support of his motion, defendant submitted the declaration of
> Juror B.  The trial court held admissible Juror B's statements that
> another juror had, during deliberations, "asserted that if [defendant]
> was innocent he would have testified in his own behalf," that
> "other jurors reminded the group they were not allowed to consider
> this in their deliberations," that the "matter came up several times
> and it appeared that some of the jurors could not discuss the
> absence of an alibi without bringing up the failure of the defendant
> to testify," and that "again the discussion moved to the lack of an
> alibi presented by the defense and the failure of [defendant] to
> testify in his own defense."  The court further admitted averments

---

[4]  Where applicable, the court refers to page numbers of the parties' pleadings by using the automated numbers assigned by the court's electronic filing system.

6

by Juror B to the effect that Juror S told the others that "his experience as a law enforcement officer [had] led him to the conclusion that if a witness is viewing a '6 pack' and says 'I think I recognize this one,' that is as good an identification as you should expect," whereas "if somebody says, 'That's him, I'm positive,' you should suspect that identification as it may be the witness trying to lay blame on somebody rather than the perpetrator."

In opposition to the motion, the prosecution submitted a declaration executed by Juror S.  The trial court admitted averments by this juror to the effect that he "[did] not recall any discussion regarding the defendant's failure to testify," that he suggested "an evidentiary pro/con list," which he subsequently recorded but as to which he made no substantive contribution, and that "[d]efendant's failure to testify was not on the pro/con list."

The trial court held that the admitted statements of Juror S did not directly refute those of Juror B, thus finding the averments summarized above to be essentially undisputed.

2. The Remarks of Juror S Concerning the Photographic Lineup Identifications

Defendant contends the trial court erred in concluding that the statements of Juror S concerning the photographic lineup testimony did not constitute misconduct.  He urges that in making these comments, Juror S improperly "functioned as an unsworn expert witness" providing "specialized information" contrary to the testimony of his own expert witness, and that the opinion expressed by Juror S served to "turn[ ] the weakness of the [prosecution's] identifications into a strength."  In defendant's view the comments were prejudicial because they effectively undermined "the heart of [his] defense" – that is, the "uncertainty of the photo-identifications made by Vershay and Samuels." Defendant argues the prejudicial effect of the comments is further demonstrated by the length of time the jury deliberated in relation to the length of the trial itself,[5] and by the jury's written request during deliberations to "review the officer's reports in which [Vershay's] and [Samuels' initial responses to the six-pack lineup is recorded – the exact quotes, [please]."[6]

_____

[5] "The trial began around 2:00 p.m. on March 15, 2006, continued all day on March 16, and concluded around 11:50 a.m. on March 17. The jury afterwards deliberated for almost eight hours over a period of two court days." (Originally footnote 7 of the opinion on petitioner's direct appeal (See Answer, Ex. 4 at  p. 11).)

[6] "On the photographic lineup signed by Samuels was a notation that she had recognized the identified person 'from [the] incident on Pintail Ave.'  The lineup signed by Vershay had a

We note that a juror, "regardless of his or her educational or employment background, [may properly] express an opinion on a technical subject, so long as the opinion is based on the evidence at trial . . . . [But a] juror should not discuss an opinion explicitly based on specialized information obtained from outside sources." (In re Malone (1996) 12 Cal.4th 935, 963.) The injection into jury deliberations of "external information . . . or specialized knowledge of a matter at issue is misconduct." ( Ibid.)

Here it does not appear that Juror S made any explicit assertion of expertise in the area of eyewitness identifications, nor any explicit claim that his conclusions were based on outside sources of specialized knowledge he had acquired by virtue of his law enforcement training. According to Juror B, Juror S claimed only to have drawn his conclusions from his law enforcement "experience." Nor do we find the conclusions of Juror S to be necessarily contrary to the evidence presented during trial, so much as a permissible interpretation of that evidence. (See People v. Steele (2002) 27 Cal.4th 1230, 1266.) Recognizing that a "fine line" exists between a juror's permissible use of his or her background to analyze evidence, and a juror's expression of an opinion based explicitly on specialized information obtained from outside sources, we nevertheless are not persuaded, on the basis of the admitted averments, that Juror S improperly crossed that line in this instance. (Ibid.) We conclude there was no misconduct, and thus do not reach the issues defendant has raised concerning prejudice.

3. The Discussion of Defendant's Failure to Testify

Defendant argues that, while the trial court was correct in concluding that the jury's discussion of his failure to testify was misconduct, it erred in concluding that the misconduct was not prejudicial. He reasons that it was prejudicial because the initial comment reportedly made by one juror – that "if [defendant] was innocent he would have testified in his own behalf" – drew an improper inference. Moreover, the jury's repeated discussion of the issue demonstrated a movement on the part of some jurors to disobey the court's instructions, which was not dispelled by the admonition given at one point by other jurors, to the effect that they were not to consider defendant's failure to testify.

The Attorney General concedes that the discussion of defendant's failure to testify constituted jury misconduct. The trial court instructed the jury not to consider or discuss that fact, and the failure of the jurors to follow that instruction was misconduct.

similar notation, to the effect that he recognized the identified person 'from the incident in question.'" (Originally footnote 8 to the opinion on petitioner's direct appeal (See Answer, Ex. 4 at 12).)

(See CAL CRIM No. 355; In re Hamilton (1999) 20 Cal.4th 273, 305 .)  Hence we focus on an independent review of the issue of prejudice. (Majors, supra, 18 Cal.4th at p. 417.)

Jury misconduct raises a rebuttal presumption of prejudice. (People v. Holloway (1990) 50 Cal.3d 1098, 1108.)  The presumption may be rebutted, inter alia, by a reviewing court's determination, upon examination of the entire record, that there is no substantial likelihood the complaining party suffered actual harm.  (People v. Hardy (1992) 2 Cal.4th 86, 174.)

Here the relevant extrajudicial evidence admitted by the trial court consists of averments made by only two of the twelve jurors.  One, Juror B, reported that during deliberations another juror voiced an impermissible inference – that is, that defendant would have testified "if [he] was innocent" – and also that the fact of defendant's failure to testify came up several times.  However, Juror B also reported that she and other jurors reminded the jury as a whole that it was not permitted to consider defendant's failure to testify.  In addition, Juror S did not recall any discussion of defendant's failure to testify, a fact indicating that the discussions that did occur were neither lengthy nor significant.  (Cf. People v. Hord (1993) 15 Cal. App.4th 711, 728.)  Moreover, it appears from Juror S's admitted averments that the jury compiled a "pro/con" list – in effect a list of those factors the jury explicitly considered in determining defendant's guilt – and that this list did not include the fact of defendant's failure to testify.

These circumstances do not in our view disclose a substantial likelihood that defendant suffered actual harm.  Juror B's declaration, that another juror stated during deliberations that Mr. Coleman would have testified "if [he] was innocent," is an after–the–fact statement of the other juror's subjective mental processes and thus inadmissible to impeach the verdict. (Evid. Code, § 1150.) This juror's expression of a personal opinion that an innocent person should profess his innocence is the type of statement that does not, without speculation, imply that the juror believed Mr. Coleman was automatically guilty.  There is no indication of how this juror's personal opinion about how one should behave influenced his decision regarding Mr. Coleman. "'Where the alleged misconduct is entirely speculative in nature, it is settled that the denial of a constitutional right resulting in essential unfairness must be established as a demonstrable reality, not as a matter of speculation.' [Citation.]" ( People v. Hood, supra, 15 Cal. App.4th at p. 725.)

We conclude the challenged misconduct was not prejudicial, and find no clear abuse of discretion in the trial court's denial of defendant's motion for a new trial on this ground.  (See Delgado, supra, 5 Cal.4th at p. 328.)

(Answer, Ex. 4 at 10-14.)

Under the Sixth Amendment, a criminal defendant has the right to be tried by an impartial jury and to confront and cross-examine the witnesses who testify against him. See Irvin v. Dowd, 366 U.S. 717, 722 (1961); Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987). In reviewing a claim of juror misconduct, "[t]he test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." United States v. Klee, 494 F.2d 394, 396 (9th Cir. 1974). See also Jeffries v. Blodgett, 5 F.3d 1180, 1189 (9th Cir. 1993) (question on habeas review is whether juror misconduct deprived defendant of his or her right to fair trial). "To obtain relief, petitioners must now show that the alleged error 'had substantial and injurious effect or influence in determining the jury's verdict.'" Id. at 1190 (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)); Fields v. Brown, 431 F.3d 1186, 1209 n.16 (9th Cir. 2005) (Brecht provides the standard of review for harmless error in cases involving unconstitutional juror misconduct).

### 1. Jurors' Comments on Petitioner's Failure to Testify

A defendant in a criminal case is entitled to a jury that reaches a verdict on the basis of evidence produced at trial. Turner v. Louisiana, 379 U.S. 466 (1965); Estrada v. Scribner, 512 F.3d 1227, 1238 (9th Cir. 2008); Raley v. Ylst, 470 F.3d 792, 803 (9th Cir. 2006). "Evidence not presented at trial, acquired through out-of-court experiments or otherwise, is deemed 'extrinsic.'" United States v. Navarro-Garcia, 926 F.2d 818, 821 (9th Cir. 1991) (citing Marino v. Vasquez, 812 F.2d 499, 504 (9th Cir. 1987)). When the jury considers extraneous or extrinsic facts not introduced in evidence, a defendant has effectively lost his Sixth Amendment rights of confrontation, cross-examination, and the assistance of counsel with regard to jury consideration of the extraneous evidence. Lawson v. Borg, 60 F.3d 608, 612 (9th Cir. 1995). A petitioner's failure to testify in his own defense is not extrinsic evidence because that fact is apparent from the trial itself and is not obtained from outside sources. Raley, 470 F.3d at 803

(citing <u>United States v. Rodriquez</u>, 116 F.3d 1225, 1226-27 (8th Cir. 1997)).  Therefore, as a general rule, a jury's discussion of a defendant's failure to testify does not violate Sixth Amendment because it does not involve the receipt of extrinsic evidence.  <u>Id.</u>  That rule applies here.  Although the jury may have violated the trial court's instructions, "what happened (or did not happen) in the courtroom was a part of the trial, not extrinsic to it."  <u>Raley</u>, 470 F.3d at 803. Petitioner is therefore not entitled to relief on this claim because it concerns only intrinsic jury processes.  <u>Id.</u> (denying federal habeas relief based upon claim that petitioner's jury during its deliberations discussed his decision not to testify); <u>United States v. Rutherford</u>, 371 F.3d 634, 639-640 (9th Cir. 2004) (finding testimony regarding a jury's consideration of the defendant's failure to testify to "not concern facts bearing on extraneous or outside influences on the deliberation").

The court also notes that Fed. R. Evid. 606(b)(2) limits a federal court's ability to consider a juror's statement regarding the validity of a verdict to "extraneous prejudicial information . . . improperly brought to the jury's attention;" "outside influence . . . improperly brought to bear upon any juror;" or "a mistake . . . in entering the verdict onto the verdict form." This rule applies to federal habeas corpus actions.  Fed. R. Evid. 1101(e); <u>Capps v. Sullivan</u>, 921 F.2d 260, 262 (10th Cir. 1990) (Rule 606(b) applies to federal habeas proceedings).  Testimony regarding the jury's consideration of a defendant's failure to testify does not qualify under any of those exceptions.  <u>Rutherford</u>, 371 F.3d at 639-640.  Therefore, the post-verdict juror affidavits submitted by petitioner in support of his jury misconduct claim cannot be considered by this court in analyzing that claim.

Even if this court were able to consider the juror affidavits submitted by petitioner in support of this claim, he would still not be entitled to federal habeas relief.  The state appellate court concluded that the jurors at petitioner's trial committed misconduct by discussing petitioner's failure to testify in his own defense but that the misconduct was harmless, for three reasons.  First, the state court found that while one juror stated petitioner would have testified if

he was innocent, and the subject of petitioner's failure to testify came up several more times during the jury's deliberations, Juror B and other jurors reminded the jury as a whole that they were not allowed to consider this factor in reaching their verdict.  Second, Juror S did not recall any discussion of petitioner's failure to testify, which indicated that any such discussions were not lengthy or significant.  Third, the "pro/con list" assembled by the jury during their deliberations did not include any item related to petitioner's failure to testify, indicating that the subject did not influence the jury's verdict.  (Answer, Ex. 4 at 13.)

"When a state court has found a constitutional error to be harmless beyond a reasonable doubt, a federal court may not grant habeas relief unless the state court's determination is objectively unreasonable."  Towery v. Schriro, 622 F.3d 300, 304 (9th Cir. 2010).  None of the California Court of Appeal's determinations of harmless error with respect to petitioner's allegations of juror misconduct was objectively unreasonable.  It appears that any reference to petitioner's failure to testify did not influence all of the jurors and was so insignificant that it did not merit mention on the list of factors that led the jury in reaching their verdict.  Accordingly, petitioner is not entitled to federal habeas relief on this claim.

### 2. Juror's Reliance on and Espousal of Specialized Knowledge

Petitioner also alleges Juror S committed misconduct when during jury deliberations he inserted his personal experience as a law enforcement officer as a basis on which to consider the reliability of lineup identifications evidence.  In some instances, a juror's injection of his personal experiences into the deliberations may constitute improper extrinsic evidence.  United States v. Navarro-Garcia, 926 F.2d 818, 821-822 (9th Cir. 1991).  "This is the case when a juror has personal knowledge regarding the parties or the issues involved in the litigation that might affect the verdict."  Id. at 821.  The introduction of prejudicial extraneous influences into the jury room constitutes misconduct that may result in the reversal of a conviction.  Parker v. Gladden, 385 U.S. 363, 364-65 (1966).

/////

12

1        However, it is not improper for a juror to bring his or her outside experiences to

2   bear during deliberations.  A constitutional violation only arises "if the jury considers a juror's

3   past personal experiences in the absence of any record evidence on a given fact, as personal

4   experiences are relevant only for purposes of interpreting the record evidence."  Navarro-Garcia,

5   926 F.2d at 822.  Although jurors naturally bring their own experiences to a case, they may not

6   "decide a case based on personal knowledge of facts specific to the litigation."  Mancuso v.

7   Olivarez, 292 F.3d 939, 950 (9th Cir. 2002).

8        Following a verdict a juror may testify on the question of whether extraneous

9   prejudicial information was improperly brought to the jury's attention.  Fed. R. Evid.

10  606(b)(2)(A).  Therefore this court may consider the declarations of Jurors B and S insofar as

11  they address Juror S's discussion of his own experience as a law enforcement officer and its

12  pertinence to the reliability of the witnesses' trial testimony.[7]

13       The California Court of Appeal determined that Juror S did not commit

14  misconduct in expressing his opinion jury deliberations about the reliability of the pre-trial

15  photographic lineup identification procedure because he did not tell the other jurors he had

16  expertise in the subject or that his opinion was based on "outside sources of specialized

17  knowledge he had acquired by virtue of his law enforcement training."  (Answer, Ex. 4 at 12.)

18  The state appellate court instead found Juror S's opinion involved a permissible interpretation of

19  the trial evidence and was based only on his personal experience.  (Id.)  This was not an

20  unreasonable application of the law against injecting extrinsic evidence into a jury deliberation.

21       In Grotemeyer v. Hickman, 393 F.3d 871, 878 (9th Cir. 2004), the Ninth Circuit

22  found it was not improper for the jury foreperson, a physician, to express her opinion that the

23  defendant's mental illness caused him to commit the crime and that he would receive adequate

24  mental health care in prison.  The court stated that it knew of no Supreme Court case "holding

25

26       [7]  The juror declarations appear in the Clerk's Transcript on Appeal at pages 186-89
     (Juror B) and 212-13 (Juror S).

that such conduct amounts to violation of [petitioner's] right to confrontation, of his right to an impartial jury, or of any other constitutional right . . . .  The mere fact that the jury foreperson brought her experience to bear on the case is not sufficient to make her alleged statements [a violation of the] constitutional right to confrontation."  Id. at 878.  The court went on to state that "[w]e have said in obiter dicta and now hold, that 'a juror's past personal experiences may be an appropriate part of the jury's deliberations.'"  Id. at 879 (quoting Navarro-Garcia, 926 F.2d at 821).

Petitioner's allegation of Juror S's misconduct is not appreciably different from the deliberations the Ninth Circuit found to be harmless in Grotemeyer.  There is no evidence or allegation that Juror S claimed he knew anything about the specific facts of the case.  Instead, it is suggested by another juror that Juror S related how his experience as a law enforcement officer influenced his own interpretation of the reliability of the victim's and witness' lineup identifications.  As the Ninth Circuit in Grotemeyer made clear, it is not only allowable but expected that a juror's own experiences will have such an influence.  "Evaluation of credibility necessarily relies on experience."  393 F.3d at 879.  Nor is it of any moment that anybody else took Juror S's opinion into account, if anybody did.  "Ideally, at least someone on a jury of twelve will be able to contribute to the rest of the jury some useful understanding about whatever evidence comes up."  Id. at 880.  There is no evidence that Juror S's mention of his own experience with lineup identifications contributed to any "useful understanding" within the jury room:  his declaration does not specifically refute the allegation that he discussed his experience as a law enforcement officer in deliberations, but there is also no indication it influenced any other juror's decision.

Petitioner has not shown that the state court unreasonably applied clearly established federal law in rejecting this aspect of his jury misconduct argument.  See 28 U.S.C. § 2254(d)(1).  Therefore, he has not established that he is entitled to federal habeas relief on this claim.

B.  Sufficiency of the Evidence – Robbery and Assault

Petitioner's next claim is that the evidence introduced at his trial was insufficient to support his convictions for robbery and assault.  (Pet. at 13.)  He notes that there was no physical evidence linking him to the assault on Mr. Vershay, and that the prosecutor was compelled to rely at trial on identifications made by the victim and the witness at the scene.  (Id.) Petitioner argues that the identifications were uncertain and unreliable based, in part, on the length of time that passed between the assault and the identification procedures, as well as the manner in  which the photographic lineup was conducted.  (Id. at 13-14.)  The California Court of Appeal rejected these arguments, reasoning as follows:

A. Sufficiency of the Eyewitness Identification Evidence

Defendant contends the evidence was insufficient for the jury to find, beyond a reasonable doubt, that he was one of those who attacked Vershay.  He notes that the only evidence linking him to the crime consisted of two photographic lineup identifications made some two months after the attack – one by Vershay and the other by Laura Samuels, one of the witnesses who attempted to intervene.  Defendant urges that the circumstances of both identifications "had none of the earmarks of reliability recognized by the courts and testified to by the [defense] expert in this case." Rather, defendant asserts that a number of factors indicate the unreliability of the identifications:  Vershay and Samuels were able to observe the attackers for a only a few, stressful moments, yet made their identifications after the passage of over two months and only after expressing their lack of confidence that they would be able to identify anyone; the photograph of defendant used in the photographic lineups did not correspond to details Vershay and Samuels had initially given the police when asked for descriptions immediately after the attack; and the police failed to administer the photographic lineups in a manner conducive to reliability, that is, the officer conducting the lineups knew which photograph was that of the suspect, he gave an admonition insufficient to offset the witnesses' assumption that the lineup would include at least one suspect, and the lineups consisted of showing a group of six photographs rather than showing six photographs one at a time.  In addition, defendant complains that the identifications were cross-racial – Vershay and Samuels are both Caucasian, whereas all the attackers had been described as African-American.

In making the foregoing objections, defendant essentially argues that the identifications on which the prosecution relied to establish him as one of the perpetrators were so unreliable as to be

15

insufficient as a matter of law.  In doing so he recapitulates, in detail, the strategy of his trial counsel, who at the outset argued to the jury that the case against defendant was one of "mistaken identification," and who sought to undermine the identifications presented by the prosecution through both cross-examination and the direct testimony of a defense witness whom the court accepted as an expert in matters relating to the reliability of eyewitness identification.

Identification evidence is, however, for the jury to weigh.  (People v. Cooks (1983) 141 Cal. App.3d 224, 278.)  Having done so, the jury in this instance concluded that defendant was guilty beyond a reasonable doubt of the offenses with which he had been charged.  Our task, in turn, is not to reweigh the evidence but to review the entire record in the light most favorable to the judgment and determine whether it discloses substantial evidence that would permit a reasonable trier of fact to reach the same conclusion of guilt beyond a reasonable doubt.  (People v. Johnson (1980) 26 Cal.3d 557, 578.)

Vershay testified that after he "blacked out" from a blow to the back of his head, the next thing he remembered was lying in the street with a paramedic standing over him.  An ambulance took Vershay to a hospital, where he was given pain medication that made him "very drowsy."  Nevertheless, he attempted to give a police officer a description of the incident when she arrived at the hospital soon afterward.  About two months after the attack, on November 20, 2003, another officer asked that Vershay view a photographic lineup of six young adult African-American males, each wearing the same type of shirt and having similar short hair.  The officer admonished Vershay, and the latter stated he did not believe he would be able to recognize anyone, because the incident "happened so fast" and left him "punch drunk."  Nevertheless he identified defendant's photograph in "[a] matter of seconds," stating at the time that he "[could not] say this is the guy who did it, but for some reason, he looks more familiar than anybody else."

At the trial, Vershay again identified the defendant and testified that he was "confident" that he recalled him "being the person who was in front of the vehicle."  As we have noted above, the man who stepped in front of the vehicle was the only assailant Vershay had an opportunity to observe before losing consciousness.  He stated he "didn't see anyone else."  Vershay further testified that the man was about 10 feet from the front of the vehicle once it stopped, and that a "face-to-face confrontation" followed, during which Vershay, at least initially, observed the man not while excited, stressed, or angry so much as "glad that [he] didn't injure anyone."

On cross-examination, Vershay stated that he had no clear recollection of statements he might have made to hospital

16

personnel or the police officer who attempted to interview him soon after the event, reiterating that he had been under the effect of pain medication.  When questioned on redirect and recross-examination, Vershay twice repeated that he was confident of his identification of defendant and would not have testified otherwise.

When asked if he thought his memory of events had improved since his initial interview in the hospital, Vershay stated, "I would say so."  The police officer who conducted the interview stated that Vershay "was very out of it" when she first arrived at the scene, and that during the interview at the hospital he appeared to be in pain.

Samuels testified that she was driving with her 10-year-old daughter when she saw several men standing near the driver door of a vehicle, kicking and beating a man lying on the street.  The attackers ran away after she parked her vehicle in a nearby lot and ran toward the scene, shouting that she was calling the police.  Again, some two months later on November 20, 2003, an officer asked Samuels to view a photographic lineup.  She remembered the officer gave her an admonishment and that she informed him she "wasn't going to be able to recognize anyone," as her focus had been on the victim.  She was surprised when she discovered "pretty quick" that she "remember[ed]" the defendant.  At trial Samuels identified the photographic lineup she had viewed – which had been composed in a manner similar to the above – described lineup Vershay viewed.  She confirmed that it was defendant's photograph she had recognized as one of Vershay's attackers.  She testified that she had recognized defendant's photograph in the lineup because she had seen his face just before he ran away from the scene, and stated further that she had been confident of her identification of defendant at the time she made it.

The officer who administered the photographic lineups confirmed the identifications made by Vershay and Samuels, and read to the jury the standard admonishment he had given both eyewitnesses at the time.[8]

/////

---

[8] "The admonishment stated the following: 'In a moment, I'm going to show you a group of photographs.  Take your time and carefully look at all the photographs before you make any decisions.  [¶]  This group of photographs may or may not contain . . . a picture of a person who committed the crime now being investigated.  Keep in mind the hair styles.  Beards and mustaches could be easily changed.  [¶]  Also, photographs may not depict the true complexion of the person.  They may be a lighter or darker depiction in the photo.  Pay no attention to markings or numbers that may appear on photo or any differences in the type or style of photographs.  [¶]  When you have looked at all the photos, tell me what you see and what you recognize.  Do not tell the other witnesses that you have or have not identified anybody.'" (Originally footnote 5 to the opinion on petitioner's direct appeal (See Answer, Ex. 4 at 6).)

17

During a brief rebuttal examination of Vershay and Samuels, both testified that they were confident of their ability to make an accurate cross-racial identification, in particular the identification of an African-American.  Vershay based his confidence on long experience working with different races in the Air Force, and noted that when he had married, his best man at the ceremony had been an African-American.  Samuels based her confidence on her experience as a human resources manager and the fact that she had "black family," noting that her own children were "half-black."

The expert defense witness discussed at length the factors that could adversely affect the reliability or accuracy of a given identification, including those factors, summarized above, that defendant emphasizes on appeal.  In concluding his direct examination, however, the expert emphasized that he was discussing factors that "make it either more or less probable" that a given identification was accurate, and was expressing no conclusion as to the reliability of any particular identification.  He agreed during cross-examination that it was "certainly possible to get an accurate identification even under the worst of circumstances."

We have reviewed the entire record and are satisfied that identifications made by Vershay and Samuels are reliable and sufficient as a matter of law.  Nor are we persuaded that the conditions under which the police administered the photographic lineups were so tainted as to preclude either eyewitness from making a reliable identification.  We conclude, rather, that the testimony we have summarized above provides substantial evidence permitting a reasonable trier of fact to find beyond a reasonable doubt that defendant was one of the perpetrators of the attack on Vershay.  (People v. Cooks, supra, 141 Cal. App.3d at p. 278; Evid. Code, § 411.)

(Answer, Ex. 4 at 3-7 (footnote omitted).)

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  See also McDaniel v. Brown, 558 U.S. 120, ___, 130 S. Ct. 665, 673-74 (2010) (finding that the Ninth Circuit erred in assessing a sufficiency of the evidence claim by failing to review all of the

1 evidence in light most favorable to the prosecution when it resolved inconsistencies in testimony

2 in favor of petitioner); Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011) (In conducting

3 federal habeas review of a claim of insufficient evidence, "all evidence must be considered in the

4 light most favorable to the prosecution.")  "[T]he dispositive question under Jackson is 'whether

5 the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'"

6 Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318).  "A

7 petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the

8 sufficiency of the evidence used to obtain a state conviction on federal due process grounds."

9 Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In order to grant the writ, the federal

10 habeas court must find that the decision of the state court reflected an objectively unreasonable

11 application of Jackson and Winship to the facts of the case.  Id. at 1275 & n.13.

12      It is the province of the jury to "resolve conflicts in the testimony, to weigh the

13 evidence, and to draw reasonable inferences from basic facts to ultimate facts."  Jackson, 443

14 U.S. at 319.  If the trier of fact could draw conflicting inferences from the evidence, the court in

15 its review will assign the inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465,

16 469 (9th Cir. 1994).  The relevant inquiry is not whether the evidence excludes every hypothesis

17 except guilt, but whether the jury could reasonably arrive at its verdict.  United States v. Mares,

18 940 F.2d 455, 458 (9th Cir. 1991).  Thus, "[t]he question is not whether we are personally

19 convinced beyond a reasonable doubt" but rather "whether rational jurors could reach the

20 conclusion that these jurors reached."  Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).

21      The question before this court is not whether the photographic lineup used to

22 inculpate petitioner passes constitutional muster; it is whether sufficient evidence supports

23 petitioner's conviction for assault and robbery of Mr. Vershay.  The evidence linking petitioner

24 to these crimes was his identification as the perpetrator by the victim, Mr. Vershay, and Ms.

25 Samuels.  Both of these witnesses identified petitioner at the photographic lineup and confirmed

26 that identification during their trial testimony.  They both testified they were confident their prior

identification was accurate, although, as discussed above, defense counsel vigorously attempted to impeach their expressed confidence on cross-examination.  Viewing this evidence in the light most favorable to the verdict, the court concludes that a rational trier of fact could have found beyond a reasonable doubt that petitioner committed the assault and robbery with which he was charged.  As explained by the California Court of Appeal, it is not the province of the courts to reweigh the identification evidence.  The question here is only whether sufficient evidence supports the jury's verdict.[9]  In this case, the testimony of the victim and the witness corroborated each other as to the identity of the perpetrator.

Accordingly, this court concludes that there was sufficient evidence introduced at petitioner's trial to support the verdict of the jury.  The state courts' denial of habeas relief with respect to petitioner's insufficiency of the evidence claim is not an objectively unreasonable application of Jackson and Winship to the facts of the case.  See Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011) (When a federal habeas court assesses a sufficiency of the evidence challenge to a state court conviction under AEDPA, "there is a double dose of deference that can rarely be surmounted."); Ngo, 651 F.3d at 1115; Juan H., 408 F.3d at 1275 & n.13.  Therefore, petitioner is not entitled to federal habeas relief with respect to this claim.

C.  Sufficiency of the Evidence – Great Bodily Injury Enhancement

Petitioner claims that the evidence introduced at his trial was insufficient to support a true finding as to the enhancement allegation of the infliction of great bodily injury.  (Pet. at 16.)  He argues that, under California law, there was insufficient evidence that he personally inflicted great bodily injury on the victim or that "the physical force that [petitioner] and other people applied at the same time combined to cause great bodily injury."  (Id.)  The California Court of Appeal rejected these arguments, reasoning as follows:

---

[9]  The court notes that "the testimony of one witness, if solidly believed, is sufficient to prove the identity of a perpetrator of crime" and "[w]hen there is some corroboration of that testimony, even greater reason exists for upholding the verdict of a jury which accepted it." United States v. Smith. 563 F.2d 1361, 1363 (9th Cir. 1977).

Section 12022.7, subdivision (a), requires the imposition of an additional and consecutive three-year term of imprisonment to punish "[a]ny person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony." Defendant challenges the jury's finding that found this enhancement allegation to be true. He reasons that the evidence was insufficient to prove beyond a reasonable doubt that he physically joined the group attack on Vershay and directly applied unlawful force sufficient to be a substantial factor in causing Vershay's resulting injuries.

On this issue, the court gave the following "group assault" instruction: "If you conclude that more than one person assaulted Keith Vershay and you cannot decide which person caused which injury, you may, but are not required to, conclude that the defendant personally inflicted great bodily injury on Keith Vershay if the People have proved that: [¶] 1. Two or more people, acting at the same time, assaulted Keith Vershay and inflicted great bodily injury on him; [¶] 2. The defendant personally used physical force on Keith Vershay during the group assault; [¶] AND [¶] 3. The amount or type of physical force the defendant used on Keith Vershay was enough that it alone could have caused Keith Vershay to suffer great bodily injury." (See CAL CRIM No. 3160.) This "group assault" instruction has recently been upheld as a proper statement of the law when the evidence presented to prove an enhancement allegation under section 12022.7, subdivision (a), shows, as it did here, a group attack resulting in great bodily injury to the victim. (People v. Dunkerson (2007) 155 Cal. App.4th 1413, 1415, 1417-1418.) Again, we apply the substantial evidence standard of review, examining the entire record in the light most favorable to the judgment to determine whether a rational trier of fact could have found true, beyond a reasonable doubt, those elements of this "group assault" instruction that defendant has challenged. (See People v. Johnson, supra, 26 Cal.3d at p. 578.)

Vershay, as we have noted, identified defendant as one of the perpetrators of the attack, specifically the one who walked in front of Vershay's vehicle and afterwards "took a jab" at Vershay through the open passenger window. Samuels testified that she first saw a car "in the middle of the road with the door open and commotion." She then "saw someone being hit and kicked and beat up." She estimated there were four or five men located "[m]ainly right where the door was opened," who were kicking and hitting Vershay as he lay on the street. When asked whether "all of the individuals who were around [Vershay were] participating in the hitting and kicking," Samuels responded that "[t]hat is what I visualized, how I remember it. Everybody was involved." When asked to clarify whether "[a]ll of them" were participating, she said, "Yes." Samuels testified that, when she first parked her vehicle and got out in order to intervene, all four or five men were still "hitting and kicking" the man on the ground. She said that a

crowd had begun to gather, "kind of watching," but testified that no one was "around the car" itself except those who were beating and kicking Vershay.  When asked if the man she had identified in the photographic lineup was "one of the people involved in the assault," she answered in the affirmative.  Samuels stated that she recognized defendant in the photographic lineup because she "saw his face."  When asked to describe the circumstances when she saw defendant's face, Samuels said she viewed his face "as [she] was running up to the situation because they were still there, then they started to leave."  (Italics added.)  On redirect, Samuels replied in the affirmative when the prosecution asked if she was "confident the day [she had] picked [defendant] out of [the] photographic lineup that he was involved in the assault on Keith Vershay."  The prosecution then asked whether, "in fact," she had told the officer who had conducted the photographic lineup that the man she had identified "was the last one standing over Keith Vershay as [she] approached."  Samuels replied, "Yes."

Another witness, Jason Guynn, observed the incident from some 50 yards away.  He saw one individual reaching into Vershay's vehicle on the passenger side.  At one point in his testimony, Guynn said that this individual walked around the rear of the vehicle to the driver's side to join "the other guys."  When faced with a police report to refresh his memory, Guynn admitted seeing "some – a couple guys, they got [Vershay] out of the car and probably all were trying to get him on the ground."

The testimony of Vershay, Samuels and Guynn was sufficient for a reasonable finder of fact to find true, beyond a reasonable doubt, the fact that defendant, from his position on the passenger side of the vehicle, moved to join other individuals who had pulled Vershay from the vehicle, and that defendant, together with all the other individuals in that group, took an active part in "kicking and beating" Vershay.  Samuels, in particular, saw no one else "around the car" other than the group attacking Vershay, and saw defendant's face as she approached, as one of the group attacking Vershay, and the last to leave when "they" began running from the scene.  Given the extreme severity of the resulting injuries to Vershay, described above, we also conclude that a reasonable trier of fact could have found, by inference, that each individual in the group of attackers, including defendant, had beyond a reasonable doubt applied an "amount or type of physical force" that "alone could have caused [Vershay] to suffer great bodily injury."  (See CAL CRIM No. 3160.)  There was, in sum, substantial evidence to support the jury's conclusion that the enhancement allegation under section 12022.7, subdivision (a), was true.

(Answer, Ex. 4 at 7-10 (footnote omitted).)

/////

1     Viewing the evidence in the light most favorable to the jury's verdict, this court

2   concludes there was sufficient evidence introduced at petitioner's trial upon which a rational trier

3   of fact could have found beyond a reasonable doubt that petitioner inflicted great bodily injury on

4   the victim, as that enhancement is defined by California law.  For the reasons described by the

5   state appellate court, there was sufficient evidence introduced at trial from which a rational juror

6   could have concluded that petitioner himself inflicted serious injury on the victim and that he did

7   so in concert with others.   For these reasons, petitioner is not entitled to federal habeas relief

8   with respect to this claim.

9     D.   Petitioner's Sentence

10     Petitioner claims that the trial court's imposition of the upper term prison sentence

11   for the robbery count, based on facts that were not charged in an accusatory pleading, found by

12   the jury, or admitted by petitioner, violated his Sixth Amendment right to a jury trial and his

13   Fourteenth Amendment right to due process.  (Pet. at 19, 58-63.)

14     The California Court of Appeal rejected petitioner's argument in this regard,

15   reasoning as follows:

16         The trial court imposed the upper term of five years imprisonment
        for defendant's conviction under section 211 based on the
17         following aggravating factors:  "the acts of the defendant constitute
        a high degree of cruelty, viciousness, and callousness; . . . the
18         victim was vulnerable . . . [;] [¶] . . . [¶]  the defendant's conduct
        indicated that he is a danger to society[; defendant] was on felony
19         probation[; and defendant's] prior performance on probation was
        totally unsuccessful."

20
         Defendant argues the imposition of the upper term violated his
21         Sixth Amendment right to have a jury determine the aggravating
        factors beyond a reasonable doubt, pursuant to Cunningham v.
22         California (2007) 549 U.S. 270 [127 S. Ct. 856, 868]
        (Cunningham), decided during the pendency of this appeal.
23
         We find no merit in this contention.  Subsequent to the decision in
24         Cunningham, supra, 127 S. Ct. 856, our Supreme Court held that
        "imposition of the upper term does not infringe upon the
25         defendant's constitutional right to jury trial so long as one legally
        sufficient aggravating circumstance has been found to exist by the
26         jury, has been admitted by the defendant, or is justified based upon

23

the defendant's record of prior convictions." (People v. Black (2007) 41 Cal.4th 799, 816 (Black).)  As defendant concedes, we are bound by that decision and thus we do not address his contention that it was wrongly decided.  (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455.)

The fact of a prior conviction has been construed to include recidivist factors generally.  (See People v. Thomas (2001) 91 Cal. App.4th 212, 221-222; see also Black, supra, 41 Cal.4th at pp. 819-820; People v. McGee (2006) 38 Cal.4th 682, 708-709.)  We decline defendant's invitation to construe that fact more narrowly.  Here, two aggravating factors on which the trial court relied were that defendant was on felony probation and that his performance on probation was "totally unsuccessful."  (See Cal. Rules of Court, rule 4.421(b)(4), (5).)  They necessarily derive from the fact of a prior felony conviction, and demonstrate recidivism in that defendant, having been given a grant of formal probation following that prior conviction, failed to comply with the terms of his probation and more specifically violated its terms by committing the felonies now under review.  In our view these factors fall properly within defendant's "record of prior convictions" for purposes of the holding in Black.  As these factors alone were a legally sufficient basis for imposing the upper term, we conclude there was no violation of defendant's right to a jury trial.[10]

(Answer, Ex. 4 at 14-15.)

A criminal defendant is entitled to a trial by jury and to have every element necessary to sustain his conviction proven by the state beyond a reasonable doubt.  U. S. Const. amends. V, VI, XIV.  The United States Supreme Court has held that the Due Process Clause of the Fourteenth Amendment requires any fact other than a prior conviction that "increases the penalty for a crime beyond the prescribed statutory maximum" to be "submitted to a jury and proved beyond a reasonable doubt."  Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); Accord Blakely v. Washington, 542 U.S. 296, 301 (2004); Cunningham v. California, 549 U.S. 270,

---

[10] "Recidivist factors are similarly exempted from those aggravating factors that must be alleged in the charging document to satisfy a defendant's constitutional due process rights.  (See Barragan v. Superior Court (2007) 148 Cal. App.4th 1478, 1483.)  Hence we reject defendant's argument that his due process rights were infringed by the prosecution's failure to allege the facts on which the trial court relied in imposing the upper term sentence for his conviction under section 211."  (Originally footnote 9 to the opinion on petitioner's direct appeal (See Answer, Ex. 4 at 15).)

274-75 (2007).  In this context, "statutory maximum" means "the maximum sentence a judge

may impose solely on the basis of the facts reflected in the jury verdict or admitted by the

defendant."  Blakely, 542 U.S. at 303.  Under California's determinate sentencing law ("DSL"),

"[t]he statute defining the offense prescribes three precise terms of imprisonment – a lower,

middle, and upper term sentence." Cunningham, 549 U.S. at 277.  Because "an upper term

sentence may be imposed only when the trial judge finds an aggravating circumstance," the

DSL's middle term is "the relevant statutory maximum." Id. at 288.

            The Apprendi decision allows for a narrow exception, as set forth in Almendarez -

Torres v. United States, 523 U.S. 224 (1998).  In Almendarez-Torres, the Supreme Court held

that the fact of a prior conviction does not have to be determined by a jury before a sentencing

court may use the conviction as the basis for a sentencing enhancement.  Rather, prior

convictions may be found by the judge based on a preponderance of evidence.  Id. at 239-47; see

also United States v. Medina-Villa, 567 F.3d 507, 520 (9th Cir. 2009) ("Almendarez-Torres

remains good law").  The task of determining the precise contours of the Almendarez-Torres

exception "has been left to the federal appellate courts." Kessee v. Mendoza-Powers, 574 F.3d

675, 678 (9th Cir. 2009).

            Here, the trial court imposed the upper term prison sentence on the robbery count

based, in part, on the fact that petitioner was on felony probation at the time of his commission of

this crime.  The California Court of Appeal determined that petitioner's probationary status

"derived from the fact" of his prior conviction and that it could therefore support the imposition

of the upper term without a jury finding.  In Butler v. Curry, the Ninth Circuit held that a

defendant's probationary status at the time of the crime does not fall within the prior conviction

exception stated in Almendarez-Torres and must be "pleaded in an indictment and proved to a

jury beyond a reasonable doubt." Butler v. Curry, 528 F.3d 624, 647 (9th Cir. 2008).  The court

in Butler conceded that its decision conflicted with the rulings in other circuit courts, which have

held that a defendant's probationary status at the time of the crime is a fact that comes within the

1   Almendarez-Torres prior conviction exception and so may be found by a judge by a

2   preponderance of the evidence.  Id. at 647 (citing cases).

3          One year after Butler, in Kessee v. Mendoza-Powers, 574 F.3d 675, 677-78 (9th

4   Cir. 2009), the Ninth Circuit acknowledged the decision in Butler but held that, in light of

5   contrary opinions from other circuits, Butler did not represent clearly established federal law for

6   purposes of the correct AEDPA analysis.  The court concluded that, for purposes of analyzing a

7   claim under 28 U.S.C. § 2254(d)(1), a state appellate court's decision affirming the imposition of

8   an increased sentence, where the enhancement was based on a finding that the defendant was on

9   probation at the time of the commission of the crime, was not contrary to clearly established

10  federal law.  The Ninth Circuit in Kessee held that "although a defendant's probationary status

11  does not fall within the 'prior conviction' exception, a state court's interpretation to the contrary

12  does not contravene AEDPA standards."  Id. at 678.[11]

13         Here, the California Court of Appeal concluded that, in imposing the upper term

14  sentence on the robbery count, the trial court was entitled to rely on the fact that petitioner was

15  on felony probation at the time of the offense and that he had violated his probation when he

16  committed his current crimes.  (Opinion at 14-15.)  Pursuant to the Ninth Circuit's decision in

17  Kessee, the state court's decision in this regard cannot be said to be contrary to or an

18  unreasonable application of established federal law.[12]

19  /////

---

20         [11]  The Ninth Circuit also observed that "[f]or purposes of AEDPA review . . . a state

21  court's determination that is consistent with many sister circuits' interpretations of Supreme
    Court precedent, even if inconsistent with our own view, is unlikely to be 'contrary to, or involve

22  an unreasonable application of, clearly established Federal law, as determined by the Supreme
    Court.'"  Kessee v. Mendoza-Powers, 574 F.3d 675, 679 (9th Cir. 2009) (quoting 28 U.S.C. §

23  2254(d)(1)).

24

25         [12]  It is worth noting that Butler was decided by the Ninth Circuit two years after
    petitioner was sentenced in 2006.  Therefore, at the time of the imposition of his sentence, clearly
    established law did not require a sentencing court to base a sentencing enhancement regarding

26  parole or probation status on a jury finding of proof beyond a reasonable doubt.

1          Furthermore, any constitutional error in sentencing petitioner to the upper term for
2  the robbery was harmless.  Apprendi errors are subject to harmless error analysis.  Washington v.
3  Recueno, 548 U.S. 212, 218-20 (2006); Estrella v. Ollison, 668 F.3d 593, 598 (9th Cir. 2011);
4  Butler, 528 F.3d at 648-49.  Petitioner is entitled to habeas relief only upon a showing that the
5  violation of his constitutional rights had a "substantial and injurious effect or influence in
6  determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting
7  Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  "Under that standard, [a reviewing court]
8  must grant relief if we are in 'grave doubt' as to whether a jury would have found the relevant
9  aggravating factors beyond a reasonable doubt."  Butler, 528 F.3d at 648 (citing O'Neal v.
10  McAninch, 513 U.S. 432, 436 (1995).).  "Grave doubt exists when, 'in the judge's mind, the
11  matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of
12  the error.'"  Id. (citing O'Neal, 513 U.S. at 435).  "[T]he relevant question is not what the trial
13  court would have done, but what it legally could have done."  Id. at 648-649.  Under California
14  law only one aggravating factor need to be proven for imposition of the upper term.  See People
15  v. Black, 41 Cal.4th 799, 806 (2007) ("Black II" ); Butler, 528 F.3d at 642-643.

16          As explained in this case by the California Court of Appeal, the trial judge
17  imposed an aggravated sentence of five years on the robbery count after finding that petitioner's
18  acts constituted a "high degree of cruelty, viciousness, and callousness;" the victim was
19  "vulnerable in that he was attacked by most of the group from behind;" petitioner's conduct
20  "indicated that he is a danger to society;" petitioner "was on felony probation;" and petitioner's
21  prior performance on probation was "totally unsuccessful."  (Reporter's Transcript on Appeal
22  (RT), Vol. 3 of 3, transcript of proceedings dated June 13, 2006, at 9.)  Based on the facts
23  presented at petitioner's trial, a jury could have concluded beyond a reasonable doubt that
24  petitioner's acts constituted a "high degree of cruelty, viciousness, and callousness" and that the
25  victim was "vulnerable in that he was attacked by most of the group from behind."  Accordingly,
26  any error by the trial judge in imposing the upper term based on these factors was harmless.

1    For all these reasons, petitioner is not entitled to federal habeas relief with respect

2  to his sentencing error claim

3        E.   Ineffective Assistance of Counsel

4        Finally, petitioner claims that his trial counsel rendered ineffective assistance

5  when he told the jury in his opening statement at trial that he would call a witness who would

6  provide an alibi for petitioner and then failed to follow through on that promise.  (Pet. at 20.)  He

7  argues that this "broken promise" prejudiced his defense and adversely affected the jury

8  deliberations and ultimate verdict.

9        On April 7, 2011, the court ordered counsel for the parties to submit supplemental

10  briefs addressing the impact of the decision in Cullen v. Pinholster, — U.S. —, 131 S. Ct. 1388

11  (2011), on the then-pending evidentiary hearing the court had previously scheduled with respect

12  to petitioner's claim that he received ineffective assistance of trial counsel.  At that time the court

13  vacated the evidentiary hearing date in order to make a determination as to whether such a

14  hearing was still appropriate in light of the Supreme Court's ruling in Pinholster.  The parties

15  have complied with the order to submit additional argument on that question.  Having considered

16  that supplemental briefing the court now concludes, for the reasons set forth below, that an

17  evidentiary hearing is still appropriate in this case.

18        1.   Background

19        Petitioner's trial counsel, Tim Pori, began his opening statement at trial by telling

20  the jury that this was "a case of mistaken identification."  (RT, Vol. 1 at 115.)  Attorney Pori

21  summarized the flaws in key eyewitnesses' testimony, described numerous problems with the

22  identification and investigation procedures utilized in the case and laid the groundwork for

23  psychological expert testimony on the fallibility of eyewitnesses' recollections in criminal cases.

24  Then he told the jury that

25        [w]hen you hear the evidence in this case, you'll acquit Mr.
         Coleman of these charges because he wasn't there.  In fact, you're
26        going to hear from a man who Mr. Coleman was working with,

1    Tom Thompson, III.  Mr. Coleman does janitorial work, and he
     was working for Mr. Thompson, III, that day.

2

3   (Id. at 119.)  Counsel would say no more about an alibi in his opening statement.

4           During the trial, the prosecution presented the testimony of the victim, Mr.

5   Vershay, who identified petitioner in the courtroom as the person who was in front of his vehicle.

6   (RT, Vol. 2 at 50-51.)  He stated he recognized petitioner from "the lineup."  (Id.)  However, on

7   cross-examination, Mr. Vershay was candid about his doubt in identifying petitioner as his

8   assailant:

9           Q.    [W]hen you saw the lineup, you weren't convinced that the
                  guy in the lineup was the guy who did it?  He just looked most
10                familiar to you; is that right?

11          A.    [Y]es, sir.

12          Q.    When you saw the photo lineup, you didn't say, "Oh, my god.
                  That's him," did you?
13
            A.    No, sir.
14

15  (Id. at 54.)  On re-direct, Mr. Vershay testified that he was "confident that [petitioner] was

16  involved" in the assault.  (Id. at 70, 72.)

17          The prosecution also called Laura Samuels as an eyewitness.  She too had

18  identified petitioner from a photographic lineup.  (Id. at 146-49).  On cross-examination, she

19  confirmed that she had described one of the assailants to police as wearing an Oakland Raiders

20  jersey.  (Id. at 155.)  Later in her trial testimony, she said that she was "not sure" that the

21  petitioner was "the guy who was wearing the jersey."  (Id. at 175.)  Finally, she admitted the

22  following in response to the prosecutor's re-direct examination as follows:

23          Q.    Today, two and a half years later, what are your feeling[s]
                  regarding the identification?
24
            A.    Not so good.
25
            Q.    In what way?
26  /////

1              A.    Just that I can't remember.

2              Q.    You can't remember today whether this was the man who
3     was at the crime scene?

             A.    Correct.
4

5 (Id. at 177.)

6              In his closing argument, petitioner's trial counsel again informed the jury that

7 "this is a case about mistaken identification." (Id. at 352.) He argued that the prosecutor had not

8 "proved beyond a reasonable doubt in the first place that my client is the one who did this vicious

9 attack." (Id.) He pointed out that neither the victim nor the eyewitness to the attack "got up

10 there and said, 'I know that's the man who did it.' Nobody got up there and pointed at him and

11 said, 'He's the one.'" (Id. at 357.) Petitioner's counsel noted there was no physical evidence

12 introduced at trial that petitioner was present at the scene and asserted that in the absence of

13 physical evidence, the prosecution had failed to show that "the procedure that was used to do the

14 identification passes muster." (Id. at 359.) He also told the jury that

15              We don't have to present all available evidence in this case. We
             don't have to prove anything. We don't have to call any witnesses.
16              The fact that we called one is a decision that I make. The
             witnesses I call, who I call, what I put on the stand, what evidence I
17              do, that's my decision. It's not my client's. So you can't discuss
             about, "He didn't call this; he didn't do that." You can't discuss
18              that.

19 (Id. at 353.)

20              In a rebuttal closing statement, the prosecutor asked the jury,

21              If your client was facing those serious charges, wouldn't you bring
             all the evidence you have to try to convince you that he's not
22              guilty? They told you in opening statements that they had an alibi
             witness. You didn't hear from any alibi witness.
23

24 (Id. at 375.)

25              Petitioner submitted his trial counsel's sworn declaration to the California Court

26 of Appeal as an exhibit to his state habeas petition. In it, attorney Pori states that when he told

the jury in his opening statement that they would hear alibi testimony from Thomas Thompson, he already knew Mr. Thompson had the following weaknesses as a witness:

> a.  The promised alibi witness, Thomas Thompson, had written to police that his record showed that Willie Coleman III was working with him in his janitorial business at the time of the crime, cleaning a community center on Judah Street in San Francisco.  However, under questioning by police, he acknowledged he had no records of the job or Willie Coleman's employment.

> b.  The only document Thompson was able to show police was a page from an appointment book showing a morning job in San Francisco on September 16, 2003, whereas Thompson had claimed that he and Coleman worked from 4:00 p.m. until midnight, and the crime occurred around 5:30 p.m.

> c.  The owner of a building that housed a community center on Judah Street told police that he was in charge of the maintenance and had never heard of Thompson.  Thompson told police he was not sure that the place he and Willie Coleman III cleaned had been on Judah Street.

> d.  Thompson did not have contact information for the person who Thompson said had retained him to do the janitorial job.

> e.  Suisun City police were aware of Thompson's claims and the above-stated weaknesses in his version of events.

(Answer, Ex. A to Ex. 5 (hereinafter "Declaration") at 1-2.)  In his declaration attorney Pori explained that, despite these problems, he decided he would introduce the alibi evidence anyway because Thompson "had not withdrawn his story despite intense questioning by police."  (Id. at 3.)  Pori also declared that he eventually decided not to introduce the evidence after "seeing the prosecution's case," even though this left him in the position of "not following through on my promise in my opening statement."  (Id.)  He surmises that he could have avoided this "mistake" by waiting to see the prosecution's case before making a final decision on whether to call Mr. Thomson as a witness or by not making an explicit promise of alibi evidence in his opening statement.  (Id.)  However, attorney Pori claims in his declaration that he "never considered" these options.  (Id.)  He states that his comments in the opening statement promising that a specific person would provide an alibi for petitioner were "not the result of a tactical decision"

and that he "simply did not weigh the advantages against the disadvantages of promising the alibi evidence before hearing the prosecution's case." (Id.)

Petitioner argued to the California Court of Appeal that his trial counsel's promise in his opening statement to present alibi evidence was unreasonable because his attorney knew the alibi evidence was weak and nonetheless made that promise to the jury before he had seen the prosecution's case. Petitioner argued to the state appellate court that "two considerations should have factored into trial counsel's decision to promise alibi evidence that he knew was weak: first, a dubious and discredited alibi damages the credibility of the defense with the jury; second, the failure to use promised evidence, particularly alibi evidence, leads the jury to infer that there was something wrong with the promised evidence." (Pet., Appendix C at 100.) Petitioner contended in his state habeas petition that a "reasonable trial counsel would have preserved the option not to use a weak alibi until he knew such alibi evidence was necessary." (Id. at 101.)

The California Court of Appeal rejected petitioner's claim of ineffective assistance of counsel, reasoning as follows:

> By this petition for writ of habeas corpus, defendant claims that he was denied effective assistance of counsel under the Sixth and Fourteenth Amendments of the United States Constitution and article I, section 15 of the California Constitution, because trial counsel told the jury he would present an alibi witness as part of the defense case, yet later decided not to call that witness.
>
> Defendant's burden to establish his claim is twofold. Defendant must show, first, that the performance of his trial counsel was deficient, and second, that he was prejudiced in that there is a reasonable probability the outcome would have been different had the deficient act or omission not occurred. (Strickland v. Washington (1984) 466 U.S. 668, 687, 694 (Strickland); People v. Ledesma (1987) 43 Cal.3d 171, 217-218 (Ledesma).
>
> Defendant supports his petition with the declaration of his trial counsel concerning his decision to make mention of the alibi witness in his opening statement, and his subsequent determination not to call the witness. He concluded that the "specific[] detailing [of] alibi evidence" had not been "the result of a tactical decision," because he "simply did not weigh the advantages against the disadvantages of promising the alibi evidence before hearing the prosecution's case." Defense counsel's declaration, that his

32

decision to mention the alibi evidence in his opening statement was "not the result of a tactical decision," is no more than a subjective assessment of his own performance.  His willingness to concede error is not dispositive of the question whether his performance meets the objective standard of reasonableness established by Strickland, supra, 466 U.S. 668.

A trial counsel's performance is deficient when it falls below an objective standard of reasonableness under prevailing professional norms.  (Strickland, supra, 466 U.S. at p. 688; Ledesma, supra, 43 Cal.3d at p. 216.)  Our scrutiny of counsel's performance "must be highly deferential."  (Strickland, supra, at p. 689.)  We must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (Ibid.)  Because of the difficulties inherent in making such hindsight evaluations, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  (Ibid.)

Under the "highly deferential" standard of Strickland, on this record, we do not regard defense counsel's tactical decision – to plan to use the alibi evidence and to mention it in his opening statement – to have been wholly beyond "the wide range of reasonable professional assistance," even though this evidence had known weaknesses and counsel later decided against its use.  (See Strickland, supra, 466 U.S. at p. 689.)

Because he has not stated facts establishing the first prong of the Strickland test, defendant's petition fails to state a prima facie case for relief.  (citation omitted.)

Therefore, the petition for writ of habeas corpus is summarily denied, without issuance of an order to show cause.

(Answer, Ex. 6 at 1-2.)

    2.  <u>Law and Analysis</u>

"A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgments."  <u>Strickland v. Washington</u>, 466 U.S. 668, 690 (1984).  Petitioner argues his trial counsel was ineffective because he knew Thompson's anticipated alibi testimony was "full of holes," yet he improperly promised this evidence "before he had the opportunity to see

the relative strength or weakness of the prosecution's case." (Pet. at 20.)  Petitioner claims he

was prejudiced by his trial counsel's error in failing to weigh the advantages and disadvantages

of promising the alibi evidence in his opening statement to the jury before he knew the strength

of the prosecution's case.  (Id. at 21.)  He states that once the alibi was promised, alibi became

"an issue in the case," and that "[counsel's] failure to present the promised alibi evidence gave

rise to an inference that there was something wrong with the alibi, and thus, with the defense's

case."  (Id.)  Petitioner contends that his trial counsel's closing argument did not ameliorate the

damage done by his failure to deliver the promised alibi testimony and that the prosecutor

capitalized on the defense's failure to produce the expected alibi witness in her closing statement

to the jury.  (Id.)  He also notes that the declarations of Juror B and Juror S establish that the jury

discussed the failure of the defense to produce the promised alibi witness.[13]  (Id. at 22.)

Petitioner states that the relative weakness of the prosecution's case against him made it "at the

very least, reasonably probable that, but for trial counsel's error, petitioner would have enjoyed a

more favorable result."  (Id.)  Petitioner notes that, while the trial itself lasted only a day and a

half, the jurors deliberated for "the equivalent of a full day."  (Id.)

       The Sixth Amendment guarantees the effective assistance of counsel.  To support

a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the

circumstances, counsel's performance fell below an objective standard of reasonableness.

Strickland, 466 U.S. at 687-88.  After a petitioner identifies the acts or omissions that breached

the standard of reasonable professional judgment, the court must determine whether, in light of

all the circumstances, the identified acts or omissions were outside the wide range of

professionally competent assistance.  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).

---

[13]  As noted above, Federal Rule of Evidence 606(b), which applies to habeas corpus petitions, limits a federal court's ability to consider a juror's statement regarding the validity of a verdict to extraneous information, outside influence, or a mistake in entering the verdict onto the verdict form.  Under this rule, these post-verdict juror affidavits cannot be considered as evidence in support of petitioner's ineffective assistance of counsel claim.

1    Second, a petitioner must show he was prejudiced by his counsel's deficient

2  performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable

3  probability that, but for counsel's unprofessional errors, the result of the proceeding would have

4  been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine

5  confidence in the outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224

6  F.3d 972, 981 (9th Cir. 2000).

7    "Judicial scrutiny of counsel's performance must be highly deferential."

8  Strickland, 466 U.S. at 689.  Therefore,

9    every effort [must] be made to eliminate the distorting effects of
     hindsight, to reconstruct the circumstances of counsel's challenged
10   conduct, and to evaluate the conduct from counsel's perspective at
     the time.  Because of the difficulties inherent in making the
11   evaluation, a court must indulge a strong presumption that
     counsel's conduct falls within the wide range of reasonable
12   professional assistance; that is, the defendant must overcome the
     presumption that, under the circumstances, the challenged action
13   "might be considered sound trial strategy."

14  Id. (citation omitted).  In cases where it is alleged that counsel was ineffective in deciding to take,

15  or not take, a certain course of action, "judicial deference to counsel is predicated on counsel's

16  performance of sufficient investigation and preparation to make reasonably informed, reasonably

17  sound judgments."  Mayfield v. Woodford, 270 F.3d 915, 927 (9th Cir. 2001) (citing Strickland,

18  466 U.S. at 691).  However, labeling a decision "trial strategy" or "tactic" does not

19  "automatically immunize an attorney's performance" from Sixth Amendment challenge.  United

20  States v. Span, 75 F.3d 1383, 1389 (9th Cir. 1996) (internal quotations omitted).  "[C]ertain

21  defense strategies may be so ill-chosen that they may render counsel's overall representation

22  constitutionally defective."  Brodit v. Cambra, 350 F.3d 985, 1003 (9th Cir. 2003).  Still, "[r]are

23  are the situations in which the 'wide latitude counsel must have in making tactical decisions' will

24  be limited to any one technique or approach."  Harrington v. Richter, — U.S. —, 131 S. Ct. 770,

25  779 (2011) (quoting Strickland, 466 U.S. at 689).

26  /////

a.  Trial Counsel's "tactical decision"

Attorney Tim Pori's sworn declaration addressing his opening statement promise of an alibi witness and the California Court of Appeal's treatment of that declaration puts the tactical nature of his decision into a crucial focus.  The state appellate court simply dismissed attorney Pori's contention that he made no "tactical" decision at all, that he simply did not weigh the advantages and disadvantages of giving the jury the expectation that the defense would call an alibi witness before he actually did just that in his opening statement.  Indeed, the state appellate court specifically gave his declaration no weight at all, stating that it was "no more than a subjective assessment of his own performance.  His willingness to concede error is not dispositive of the question whether his performance meets the objective standard of reasonableness established by Strickland[.]" (Answer, Ex. 6 at 1-2).

The state appellate court accurately described attorney Pori's declaration as a "subjective assessment of his own performance."  (Id.)  However, the state court was too dismissive of that assessment as merely "subjective."[14]  Subjectivity in this context – that is, the strategic or tactical thinking (or lack of it) that actually determined a lawyer's conduct – is critically important because the deference established in Strickland is afforded only to conduct that results from decisions that were in fact strategic.  Thus, as one court has observed:  "Tactical decisions of trial counsel deserve deference when:  (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances."  Carpenter v. Kernan, No. C 06-7408 JSW (PR), 2009 WL 3681684 at *16 (N.D. Cal. Nov. 2, 2009) (emphasis added).  The first

---

[14]  Cf. Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 790 (2011), wherein the Supreme Court reiterated that "Strickland . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind."  This affirmation of the Strickland legal standard is distinct from the factual premise that the court examines here – i.e., whether petitioner's trial counsel actually made, in his own mind, a strategic decision.  The court proceeds with this inquiry mindful of Strickland's "'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'"  Id. (citations omitted).

1  determination – whether a decision was in fact a strategic one – is not subject to serious dispute

2  in most claims of ineffective assistance of counsel.  Still, it is unreasonable to assume that every

3  course of conduct by an attorney was the product of some kind of strategic calculation.  See

4  Wiggins v. Smith, 539 U.S. 510, 526 (2003) (reversing the federal appellate court's decision

5  because its "assumption that the investigation was adequate . . . reflected an unreasonable

6  application of Strickland").

7         Simply put, where there was no decision, there could not have been any reasoned

8  professional judgment, and thus there should be no deference on habeas review.  See Strickland,

9  466 U.S. at 691 (stating that it is necessary to "apply[] a heavy measure of deference to counsel's

10  judgment") (emphasis added); Wiggins, 539 U.S. at 526 (explaining that "[t]he record of actual

11  sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting

12  that their failure to investigate thoroughly resulted from inattention, not reasoned strategic

13  judgment") (emphasis added).[15]

14         "Although the reasonableness of counsel's decision is best described as a question

15  of law, whether [counsel's] actions were . . . 'tactical' is a question of fact."  Edwards, 475 F.3d

16  at 1126.  Indeed, according to the Supreme Court in Strickland, a claim of ineffective assistance

17  of counsel presents a mixed question of law and fact.  See 466 U.S. at 698.  Furthermore, "a

18  federal court reviewing a state court conclusion on a mixed issue involving questions both of fact

19

20         [15]  Former U.S. Supreme Court Justice John Paul Stevens described the easily overlooked
factual presumption at which a court must occasionally pause in a Strickland inquiry:

22         A decision cannot be fairly characterized as "strategic" unless it is
           a conscious choice between two legitimate and rational
23         alternatives.  It must be borne of deliberation and not
           happenstance, inattention, or neglect ... Although we afford
24         deference to counsel's strategic decisions, for this deference to
           apply there must be some evidence that the decision was just that:
25         strategic.

26  Wood v. Allen, 558 U.S. 290, ___, 130 S. Ct. 841, 853 (2010) (Stevens, J., dissenting) (citing
   Wiggins and Strickland)

and law must first separate the legal conclusions from the factual determinations that underlie it." Lambert v. Blodgett, 393 F.3d 943, 978-79 (9th Cir. 2004).  So, while the inquiry into whether petitioner's trial counsel did, in fact, make a "tactical" decision is not by itself dispositive of petitioner's ineffective assistance claim.  Rather, the resolution of that issue is a critical factual predicate to the completion of the appropriate legal analysis – i.e., whether any court, state or federal, must give the usual heightened Strickland deference to attorney Pori's promise of alibi evidence to the jury when he did not know if he would keep that promise.  "Therefore, we must initially decide whether the state court made an unreasonable determination of the facts in light of the evidence before it" when it analyzed attorney Pori's opening statement as reflecting a "tactical decision."  Edwards, 475 F.3d at 1126.   In other words, this court must proceed first with an analysis of petitioner's challenge under § 2254(d)(2).  See Carpenter, 2009 WL 3681684 at *16 (citing Edwards for the proposition that "[w]hether counsel's actions were indeed tactical is a question of fact under 28 U.S.C. § 2254(d)(2)").

   b. Whether the State Court Made an Unreasonable Determination of Fact

   As the Ninth Circuit has recognized,

> [c]hallenges under § 2254(d)(2) fall into two main categories.  First a petitioner may challenge the substance of the state court's findings and attempt to show that those findings were not supported by substantial evidence in the state court record. Second, a petitioner may challenge the fact-finding process itself on the ground that it was deficient in some material way.

Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th Cir. 2012) (citing Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004)).[16]

/////

---

[16]  The Ninth Circuit has also identified a third category of challenges under § 2254(d)(2), "the simplest[,] where the state court should have made a finding of fact but neglected to do so. In that situation, the state-court factual determination is perforce unreasonable and there is nothing to which the presumption of correctness can attach."  Taylor v. Maddox, 366 F.3d 992, 1000-01 (9th Cir. 2004).

Petitioner's argument that the state court made a finding "in direct contradiction of the record before it" falls more squarely under the first category of 2254(d)(2) challenges.  The state appellate court characterized trial counsel's opening statement promise to present alibi testimony at trial as "counsel's tactical decision" even though the only evidence before that court, attorney Pori's own declaration, stated the opposite.  Still, it must be said that the state court was not obligated to take attorney Pori's self-effacing report on his performance completely at face value.  The Ninth Circuit has acknowledged, without outright declaring, that there may be a credibility determination inherent in assessing a defense lawyer's "'self-proclaimed assertion' . . . of inadequate performance" and has deferred to a state trial court's determination that a lawyer had, in fact, made a strategic decision and not simply, as the lawyer himself tried to characterize it, an unknowing "mistake."  Edwards, 475 F.3d at 1126.

Other federal courts have expressed their reservations about the reliability of such petitioner-friendly affidavits, often sworn and submitted long after trial, in which former counsel extends his zealous defense so far as to "fall on his sword" and confess a Strickland violation that would, if proven, benefit his former client on collateral review.  The Seventh Circuit, for example, has approvingly cited and deferred to a state court's finding that a lawyer could no more rely on the clarity of her own professional hindsight than could a judge in assessing the lawyer's effectiveness as defense counsel after the fact.  McAfee v. Thurmer, 589 F.3d 353, 356-57 (7th Cir.2009)   Rather, the court focused solely on the reasonableness of the state court's determination of the facts surrounding the lawyer's conduct at trial:

> At the postconviction hearing on [petitioner's] Sixth Amendment claim, his attorney testified that upon reflection, she should have used a [different approach at trial].  But again, this kind of reflection after the fact is irrelevant to the question of ineffective assistance of counsel.  Moreover, the State argued that [petitioner's] lawyer appeared to be falling on her sword for the sake of her client.  The Wisconsin trial judge agreed.  He found her testimony of "limited usefulness to the Court" as she testified "in a manner which appeared to be calculated to aid the defendant."  The judge thought the attorney conceded error in the hopes of securing a new trial for her former client.  As a result, her testimony that she

1  was "rattled" and had made an "overzealous probably
2  inappropriate indictment of a police officer" did not seem all that
   believable.  The state judge found that trial counsel's performance
3  was not constitutionally ineffective.

4  McAfee, 589 F.3d at 356-57.

5      The Tenth Circuit has been even more blunt in expressing its skepticism of

6  lawyers who immolate their own effectiveness to boost their client's chances of obtaining habeas

7  relief.  In addressing a trial counsel's newfound "disavowal" of repeated assurances to the trial

8  court that her client was competent to plead guilty to capital murder, that federal appellate court

9  observed that counsel's "about-face on the competency issue strongly suggests a willingness to

10  'fall on the sword' in order to derail a death sentence.  The motive is transparent, if not

11  misguided."  Allen v. Mullin, 368 F.3d 1220, 1240 (10th Cir. 2004).

12      What decisions such as these teach is that once a lawyer decides to impeach the

13  constitutionality of his or her own performance in a post-conviction proceeding, half of the

14  "doubly deferential"[17] standard familiar to ineffective assistance of counsel claims – that is, the

15  deference the federal court gives to trial counsel under Strickland and to the state court under §

16  2254 – essentially evaporates.  So, while federal habeas courts ordinarily owe wide deference to

17  actual tactical decisions of lawyers undertaken in the defense of their client, the court need not

18  accord that deference when the lawyer volunteers after-the-fact that he or she violated the client's

19  Sixth Amendment right to effective counsel.  Rather, the reliability of a lawyer's willingness to

20  "fall on the sword" must be gleaned on a case-by-case basis and a federal habeas court must

21  assess the reasonableness of the state court's treatment of defense counsel's representations of his

22  or her own work "in light of the evidence presented at the State court proceeding."  28 U.S.C. §

23  2254(d)(2).

24

25  [17]  "The standards created by Strickland and § 2254 are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  Harrington, 131 S. Ct. at 788 (citations omitted).  See also Rogovich v. Ryan, 694 F.3d 1094, 1105 (9th Cir. 2012); Hibbler v. Benedetti,
26  693 F.3d 1140, 1150 (9th Cir. 2012).

In <u>McAfee</u> and <u>Allen</u>, discussed above, the would-be sword-takers' testimony was contrary to other objective evidence regarding their performances, and, more importantly, the lawyers were subject to the state court's direct scrutiny and cross-examination in the courtroom. The state courts did not believe the lawyers' self-critical reflections in either case, and the federal habeas courts deferred to those credibility determinations in both.

But here the record contains no alternative, objective evidence of attorney Pori's decision-making, nor was there a post-conviction hearing conducted in state court to scrutinize what mental processes led him to make such a promise to the jury in his opening statement that he might not keep. Other than the trial transcript and exhibits, the state record consists solely of trial counsel's declaration in which he states that he "simply did not weigh the advantages and disadvantages of promising the alibi evidence before hearing the prosecution's case." In that respect, this case resembles the situation faced by the court in <u>Dugas v. Coplan</u>, 428 F.3d 317, 325 (1st Cir. 2005). That case involved an arson prosecution in which the state court had heard unimpeached testimony from defense counsel in a post-conviction hearing that "he had no justifiable reason not to consult an expert since there was no risk in doing so and the money was available. He confessed that he 'didn't give it enough consideration at the time[.]'" <u>Dugas</u>, 428 F.3d at 325. As is the case here, defense counsel expressly denied making any tactical decision in which he weighed the costs and benefits of taking the course of action that was now being challenged as ineffective representation, and, as is the case here, there was no evidence to the contrary. The state court had found counsel's admissions "'remarkably candid,'" but, despite counsel's testimony otherwise, it ruled that he <u>had</u> "considered the benefits and perils of hiring an expert," <u>id.</u> at 332, and "weighed his options and made 'a strategic decision . . . based on twenty years experience and his familiarity with the various players involved in this particular case.'" <u>Id.</u> at 325-26. On federal habeas review, both the District Court and the First Circuit concluded that the state court had made an unreasonable determination of the facts in light of the record. In this regard, the First Circuit concluded:

> According to [counsel's] testimony in state postconviction
> proceedings, no such balancing of "benefits and perils" took place
> . . . .  The state court's contrary conclusion . . . therefore reflects
> "an unreasonable determination of the facts in light of the evidence
> presented in the State court proceeding[.]" § 2254(d)(2).
> Moreover, "this partial reliance on an erroneous factual finding . . .
> highlights the unreasonableness of the state court's decision."  The
> state court's conclusion that counsel made a tactical decision to
> forego expert consultation is inconsistent with how counsel
> actually proceeded and appears to be "more a post-hoc
> rationalization of counsel's conduct than an accurate description."

Id. at 332-33 (quoting Wiggins, 539 U.S. at 528, 526-27).

Here, the state court was correct that attorney Pori's post-conviction self-review of his performance is not dispositive of petitioner's ineffective assistance of counsel claim. However, in the absence of any contrary evidence, it was not reasonable to dismiss the import of attorney Pori's declaration out of hand and proceed on the assumption that he had, in fact, made a tactical decision.  Thus, in this case there simply was no actual evidence – and therefore no reasonable basis – to support the state court's factual determination that petitioner's trial counsel made a tactical decision when he promised the jury alibi testimony in his opening statement that he never produced.  "Factual findings are unreasonable if they are unsupported by sufficient evidence in the state court record."  Tong Xiong v. Felker, 681 F.3d 1067, 1074 (9th Cir. 2012) (citing Taylor, 366 F.3d at 1007-08).

The Ninth Circuit has recently discussed some of the permutations of unreasonable factual determinations under § 2254(d)(2), including some in which "the fact-finding process itself was deficient in some material way."  Hibbler, 693 F.3d at 1146.  In this regard, the Ninth Circuit said that

> [i]n some limited circumstances, we have held that the state court's
> failure to hold an evidentiary hearing may render its fact-finding
> process unreasonable under § 2254(d)(2).  For example, we have
> held that a state court's resolution of a "credibility contest"
> between a petitioner and law enforcement officers was an
> unreasonable determination of fact where the evidence in the
> record was consistent with the petitioner's allegations. . . .  A state
> court's decision not to hold an evidentiary hearing does not render
> its fact-finding process unreasonable so long as the state court

could have reasonably concluded that the evidence already adduced
was sufficient to resolve the factual question.

Id. at 1147 (citations omitted).

Certainly after-the-fact statements by defense attorneys regarding their own performances, especially "fall on the sword" declarations that appear tailored to benefit a former client on habeas review, may reasonably present credibility issues.  That is certainly true in this case.  At the very least, they call for the development of as complete a picture of the actual circumstances that informed a lawyer's decision (or, as alleged here, his non-decision) as possible.  That too was true here, and the state appellate court had no basis for reaching the opposite conclusion without any objective evidence supporting that finding.  Furthermore, the state appellate court itself acknowledged that it's treatment of attorney Pori's declaration was central to its rejection petitioner ineffective assistance of counsel claim in that the finding that trial counsel made a tactical choice triggered Strickland's "virtually unchallengeable"[18] presumption that was decisive of the issue in this case.  Thus, the state appellate court in rejecting habeas relief concluded:

> Under the "highly deferential" standard of Strickland, on this record, we do not regard counsel's tactical decision – to plan to use the alibi evidence and to mention it in his opening statement – to have been wholly beyond "the wide range of reasonable professional assistance," even though this evidence had known weaknesses and counsel later decided against its use.

(Answer, Ex. 6 at 2 (citation omitted).)

As the Ninth Circuit has observed under similar circumstances, "if the state court had first conducted an evidentiary hearing and had then arrived at the same inferences and credibility determinations, we would not be second-guessing those procedures and results as objectively unreasonable."  Nunes v. Mueller, 350 F.3d 1045, 1056 (9th Cir. 2003).  See also

---

[18] Strickland, 466 U.S. at 690.

1   Hurles v. Ryan, 650 F.3d 1301, 1312 (9th Cir. 2011) ("We have repeatedly held that where a

2   state court makes factual findings without an evidentiary hearing or other opportunity for the

3   [presentation of] evidence, 'the fact-finding process itself is deficient' and not entitled to

4   deference.")  Here, from the basis of no evidence, the state appellate court construed attorney

5   Pori's conduct to be the product of "a tactical decision," a characterization exactly opposite from

6   attorney Pori's uncontradicted, sworn assertion, and it did so without a hearing.  In other words,

7   the state court made an unreasonable determination of fact in rejecting petitioner's claim of

8   ineffective assistance of counsel.  28 U.S.C. § 2254(d)(2).

9                    c.   Whether to Hold an Evidentiary Hearing

10                    Once a federal habeas court finds that the underlying state court decision was

11   based on an unreasonable determination of fact, the federal court must conduct a de novo review

12   of petitioner's claims.  Delgadillo, 527 F.3d at 925.  At that point, "the judge must review the

13   answer, any transcripts and records of state-court proceedings, and any materials submitted under

14   Rule 7 to determine whether an evidentiary hearing is warranted."[19]  Rule 8(a) of the Rules

15   Governing Section 2254 Cases in the United States District Courts.  However, § 2254(e)(2)

16   precludes an evidentiary hearing in federal court "[i]f the applicant has failed to develop the

17   factual basis of a claim in State court proceedings."  That statutory pre-condition does not apply

18   here.  Respondent has conceded that, for purposes of § 2254(e)(2), "petitioner submitted to the

19   state courts the factual basis for the claim at issue here, ineffective assistance of counsel."

20   (Respondent's Supplemental Brief (Dkt. No. 24) at 3 n.1.)  This concession is appropriate in light

21   of petitioner's submission of his trial counsel's affidavit to the state courts.  Therefore this court

22   need not inquire whether petitioner developed the factual basis in support of his ineffective

23   assistance of trial counsel claim, and § 2254(e)(2) does not bar an evidentiary hearing.

24   _____

25        [19]  The wording of Rule 8 effectively requires the court to decide whether or not to hold
     an evidentiary hearing.  The fact that in this unusual case neither party seeks such a hearing is
26   therefore not determinative.

1          Even if petitioner's development of a factual basis in support of his ineffective

2   assistance of counsel claim in state court were contested under § 2254(e)(2), the court would find

3   that an evidentiary hearing is permissible here under the diligence requirement of section

4   2254(e)(2)(A)(ii).  "Diligence will require in the usual case that the prisoner, at a minimum, seek

5   an evidentiary hearing in state court in the manner prescribed by state law." Williams (Michael)

6   v. Taylor, 529 U.S. 420, 437 (2000).  Under California law, an appellate court determines

7   whether an evidentiary hearing is appropriate in a habeas case only after the parties file formal

8   pleadings, if they are ordered to do so.  See Horton v. Mayler, 408 F.3d 570, 582 n.6 (9th Cir.

9   2005).  Formal pleadings are filed only if the state court issues a show cause order; therefore, a

10  prisoner must obtain a show cause order before he requests an evidentiary hearing.  People v.

11  Romero, 8 Cal.4th 728, 739 (1994) (a California state court does not decide whether to hold an

12  evidentiary hearing until after it receives the return and traverse required by a show cause order).

13  "If the state court denies the petition without ordering formal pleadings, the case never reaches

14  the stage where an evidentiary hearing must be requested and the petitioner's failure to request a

15  hearing . . . does not trigger § 2254(e)(2)." Skains v. Yates, No. Civ. S-06-0127 LKK GGH P,

16  2008 WL 2682512 at *1 (E.D. Cal June 30, 2008).  See also Neely v. Director, No. CIV S-08-

17  1416 KJM P, 2010 WL 1267808 at *3 (E.D. Cal. March 31, 2010) ("If section 2254(e)(2)

18  imposes a diligence requirement . . ., petitioner has satisfied it" because "the state courts denied

19  the petition without issuing an order to show cause" and the state habeas proceedings therefore

20  "never reached the stage at which petitioner could request an evidentiary hearing[.]")

21          Here, petitioner requested a show cause order in state court.  (See Answer, Ex. 5

22  at 8.)  The California Court of Appeal denied the petition without a granting a show cause order,

23  thus eliminating the possibility of an evidentiary hearing before petitioner could meaningfully

24  request one.  (Id., Ex. 6 at 2.)  Petitioner's request for a show cause order was all the diligence

25  required under state law; thus § 2254(e)(2) is no bar to an evidentiary hearing with respect to his

26  ineffective assistance of counsel claim in these federal habeas proceedings.

1    Nor does the Supreme Court's decision in <u>Cullen v. Pinholster</u>, bar an evidentiary

2    hearing here.  In that case the Supreme Court held that "review under § 2254(d)(1) is limited to

3    the record that was before the state court that adjudicated the claim on the merits."  <u>Id.</u> at 1398.

4    However, "<u>Pinholster</u> isn't relevant where, as here, petitioner surmounts section 2254(d)(2)[.]"

5    <u>Williams v. Woodford</u>, 859 F. Supp.2d 1154, 1161 (E.D. Cal. 2012).[20]

6    In <u>Williams</u>, the court found that "'the state court fact-finding process was

7    fundamentally flawed' because it 'granted no evidentiary hearing or other opportunity for

8    [petitioner] to develop his claim.'"  <u>Id.</u> at 1160 (citation omitted).  That ruling applies with equal

9    force here, where petitioner requested a show cause order – the procedural predicate for an

10   evidentiary hearing – which was denied.  Moreover, the Supreme Court's ruling in <u>Pinholster</u> is

11   expressly limited to claims analyzed under 28 U.S.C. § 2254(d)(1).  <u>Pinholster</u>, 131 S. Ct. at

12   1398 (analyzing the language of § 2254(d)(1)).  The Court's limitation of analyses under §

13   2254(d)(1) "to the record that was before the state court that adjudicated the claim on the merits,"

14   <u>id.</u>, is superfluous in deciding whether to hold an evidentiary hearing here, since § 2254(d)(2),

15   which governs this analysis, contains the same express limitation and, in any event, the court has

16   concluded that petitioner has shown the state court made an unreasonable determination of fact,

17   thus clearing the way for <u>de novo</u> review in these habeas proceedings.

18   The question of whether to hold an evidentiary hearing in this case, then, is one

19   over which the court is to exercise its sound discretion.  AEDPA did not change the standards by

20   which a federal court exercises that discretion.  <u>See Schriro v. Landrigan</u>, 550 U.S. 465, 473

21   (2007).  "In deciding whether to grant an evidentiary hearing, a federal court must consider

22   whether such a hearing could enable an applicant to prove the petition's factual allegations,

23   which, if true, would entitle the applicant to federal habeas relief."  <u>Id.</u> at 474.  As discussed

24   above in addressing the state court's summary treatment of trial counsel's declaration, the

25
26   [20] <u>Williams v. Woodford</u> was decided by Chief Judge Alex Kozinski of the Ninth Circuit Court of Appeals, sitting by designation in this court.

credibility determination that often attends such "fall on the sword" affidavits is often best settled by a live hearing. That is the case here.

It is also the case that if petitioner proves his allegations of ineffective assistance of counsel, he would be entitled to federal habeas relief. The Ninth Circuit has not applied Strickland to a case in which defense counsel promised certain testimony and then failed to deliver on that promise at trial. See Nguyen v. Cate, No. C 09-03980 JSW, 2012 WL 850609 at *8 (N.D. Cal. March 13, 2012). The First Circuit, however, has expressed skepticism against deferring completely to trial counsel's decision in such cases, making clear its view that "little is more damaging than to fail to produce important evidence that had been promised in an opening." Anderson v. Butler, 858 F.2d 16, 17 (1st Cir. 1988). In Anderson, defense counsel reneged on his opening statement promise to present expert psychiatric testimony in support of the defendant, who faced a charge of first degree murder. The court "consider[ed] the totality of the opening" and found that the damage to the defense was acute

> when the opening was only the day before [the defense rested its case], and the jurors had been asked on voir dire as to their acceptance of psychiatric testimony. The promise was dramatic, and the indicated testimony strikingly significant. The first thing that the ultimately disappointed jurors would believe, in the absence of some other explanation, would be that the doctors were unwilling, viz., unable, to live up to their billing. This they would not forget.

Id. at 17. The court in Anderson was not moved by the state court's finding that the promised evidence included written psychological reports that could, if exposed during the experts' testimony, reflect negatively on the defendant. "[I]f it was . . . wise [not to call the experts to testify] because of the damaging collateral evidence, it was inexcusable to have given the matter so little thought at the outset as to have made the opening promise.'" Id. at 18. The First Circuit also found that trial counsel's failure to follow through on that promise was, as to the first Strickland prong, without strategic justification and, as to the second, "prejudicial as a matter of law." Id. at 19.

1           The First Circuit implicitly reaffirmed the <u>Anderson</u> holding in another habeas

2  case, finding that defense counsel's promise that the jury would hear the defendant testify on his

3  own behalf was, in light of counsel's subsequent advice to his client not to take the stand,

4  "indefensible." <u>Ouber v. Guarino</u>, 293 F.3d 19, 28 (1st Cir. 2002).  The court in <u>Ouber</u>, as that in

5  <u>Anderson</u>, found that such conduct could not be accepted "as part and parcel of a reasoned

6  strategy." <u>Id.</u>  Moreover, the court concluded that the considerable deference usually afforded a

7  lawyer's tactical choices vanished because "the lawyer structured the entire defense around the

8  prospect of the petitioner's testimony." <u>Id.</u> When "a broken promise of this magnitude" happens

9  without adequate reason or explanation, said the court, "common sense suggests that the course

10  of the trial may be profoundly altered." <u>Id.</u>  The court in <u>Ouber</u> was particularly critical of trial

11  counsel's misjudgment because the usual explanation – that the vicissitudes of a criminal trial

12  forced an unforeseeable change in plans – was unsupportable.  "Here, everything went according

13  to schedule:  nothing occurred during the trial that could have blindsided a reasonably competent

14  attorney or justified a retreat from a promise previously made." <u>Id.</u>  The court was no more

15  charitable in rejecting the argument that a defendant's decision whether to testify is, in every

16  case, a "strategic choice, requiring a balancing or risks and benefits." <u>Id.</u>  Rather, the court

17  observed:

> It is easy to imagine that, on the eve of trial, a thoughtful lawyer
> may remain unsure as to whether to call the defendant as a witness.
> If such uncertainty exists, however, it is an abecedarian principle
> that the lawyer must exercise some degree of circumspection.  Had
> the petitioner's counsel temporized... this would be a different
> case.

<u>Id.</u> As it did in <u>Anderson</u>, the First Circuit in <u>Ouber</u> ultimately found that the broken promise of

trial counsel's opening statement met both <u>Strickland</u> prongs:  it was unreasonable and

/////

/////

/////

1   prejudicial as a matter of law.[21]

2          Judicial authority from closer to home provides additional guidance on this point.

3   In United States v. Crawford, 680 F. Supp.2d 1177 (E.D. Cal. 2009), a federal prisoner moved

4   under 28 U.S.C. § 2255 to have his judgment of conviction and sentence vacated, arguing that his

5   trial lawyer was unconstitutionally ineffective for, among other things, promising in his opening

6   statement that the jury would hear testimony that his client was framed and then failing to

7   produce that evidence at trial.  The trial judge presiding over Crawford approached the post-trial

8   claim for relief somewhat more conditionally than the First Circuit, stating that "[f]ailure to

9   produce a witness promised in opening statement may constitute ineffective assistance of

10  counsel," and "[w]hether [counsel] acted appropriately is evaluated by the nature of the

11  promise(s) made during his opening statement."  Id. at 1194-95, 1197 (emphasis added).  That is

12  not to say, that the court in Crawford applied Strickland in a way substantively different from the

13  First Circuit in Anderson and Ouster.  Rather, the court in Crawford drew from those and other

14  decisions, factors to consider in assessing the reasonableness of trial counsel's performance

15  under the circumstances.  In finding that there was no Strickland violation, the court in Crawford

16  asked:  (1) if the promise was "dramatic;" (2) whether the evidence omitted would have been

17  significant; (3) whether the promise was general or specific; (4) whether the testimony was

18  elicited through other means; and (5) whether the time lapse between the promise in opening

19
20          [21]  The Seventh Circuit has also refused to extend the deference due reasonable tactical
    decisions when a lawyer unnecessarily promises key evidence in his or her opening statement and
    then breaks that promise without reasonable justification.
21
                Making such promises and then abandoning them for reasons that
22              were apparent at the time the promises were made cannot be
                described as legitimate trial strategy.  Promising a particular type
23              of testimony creates an expectation in the minds of jurors, and
                when defense counsel without explanation fails to keep that
24              promise, the jury may well infer that the testimony would have
                been adverse to his client and may also question the attorney's
25              credibility.  In no sense does it serve the defendant's interests.

26  United State ex rel. Hampton v. Leibach, 347 F.3d 219, 259 (7th Cir. 2003).

1    statement and submission of the case to the jury was relatively short or long.  Id. at 1195-1202.

2         Even more recently, in Williams v. Woodford, Chief Judge Kozinski found that

3    defense counsel provided constitutionally deficient assistance when he promised jurors in

4    opening statement they would hear from two alibi witnesses as well as the defendant and

5    thereafter failed to put any of the witnesses on the stand at trial.  The court compared the conduct

6    of counsel in that case to the deficient performances rendered in Anderson, Ouber and Leibach,

7    among other cases, and found that "the failures in many of those cases were less serious than the

8    broken promises here; none was more serious."  Williams, 859 F. Supp.2d at 1171.  The court

9    further found that defense counsel's broken promises in that case were "prejudicial not only

10   because of their harm but because of just how close a case this was."  Id. at 1172.  The court in

11   Williams acknowledged that each of the promised witnesses would have brought his or her own

12   weaknesses to the defense and that on that basis alone "[i]t would be a close call whether mere

13   failure to put these witnesses on the stand prejudiced [the defendant]."  Id. at 1173.  But "[w]hat

14   fatally undermined [the] defense were counsel's unfulfilled promises that these witnesses would

15   testify. . . .  Every indication is that this one came down to the wire.  Effective assistance of

16   counsel, rather than unfulfilled promises, might well have changed the outcome."  Id.

17        Finally, in Madrigal v. Yates, 662 F. Supp.2d 1162 (C.D. Cal. 2009), the court

18   discussed the decisions in Ouber and Leibach and distilled the most common factor that

19   Strickland violations share in such "broken promises" cases:

20        [W]hen the failure to present the promised testimony cannot be
          chalked up to unforseeable events, as the Court has determined is
21        the case here, the attorney's promise may be unreasonable, for
          "little is more damaging than to fail to produce important evidence
22        that had been promised in an opening."

23   Id. at 1184 (quoting Anderson, 858 F.2d at 17) (emphasis added).  The court in Madrigal noted,

24   like Chief Judge Kozinski in Williams, that the case against the defendant was "weak."  Id. at

25   1185.  It also found that "[i]n a borderline case, such as this one, 'even a relatively small error is

26   /////

50

1  likely to tilt the decisional scales.'" Id. (quoting Ouber, 293 F.3d at 33).[22]

2          This court finds that petitioner's claim of ineffective assistance of trial counsel in

3  this case should, indeed can only, be resolved after full development of the facts that informed

4  trial counsel's decision to promise the alibi witness in his opening statement to the jury despite

5  known weaknesses in that witness' credibility.  The primary source of that evidence will be

6  attorney Pori's live testimony.  However, the parties are admonished to use the above discussion

7  of the applicable case law on "broken promises" as a guide as to what other forms of evidence

8  and argument may be appropriate for the court's consideration in determining whether petitioner

9  is entitled to federal habeas relief.

CONCLUSION

11          For the reasons set forth above, IT IS HEREBY ORDERED as follows:

12          1.  Petitioner's application for a writ of habeas corpus is denied as to all claims

13  except his claim that he received ineffective assistance of trial counsel; and

14          2.  A status conference is set for December 18, 2012 at 10:00 a.m. in Courtroom

15  27, at which time counsel shall be prepared to schedule an evidentiary hearing date and to discuss

16  the manner and length of any anticipated testimony or other evidence to be presented.

17  DATED: November 30, 2012.

*Dale A. Drozd*

_____

DALE A. DROZD

UNITED STATES MAGISTRATE JUDGE

dad1.habeas
cole0020.opinion.ord.wpd

---

[22]  The court in Williams cited and relied upon the decisions in Madrigal alongside
Anderson, Ouber and Leibach as persuasive authority.